**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**NORTHERN DIVISION**
**AT COVINGTON**

**CIVIL ACTION NO. 12-217-DLB-JGW**

**ELLEY A. LOPREATO, ET AL.**                              **PLAINTIFFS**

**vs.**                  **MEMORANDUM OPINION AND ORDER**

**SELECT SPECIALTY HOSPITAL-NORTHERN KENTUCKY, LLC**
**d/b/a SELECT SPECIALTY HOSPITAL, ET AL.**           **DEFENDANTS**

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Defendants Select Specialty Hospital-Northern Kentucky, LLC d/b/a Select Specialty Hospital and Select Medical Corporation[1] (collectively, "Select") move for summary judgment as to the instant claim of disability discrimination brought pursuant to the ADA by Elley A. Lopreato and Susan M. Taylor (collectively, "Plaintiffs"). Applying the *McDonnell Douglas* framework, Select argues that Plaintiffs are unable to satisfy certain required elements of their prima facie case, particularly, the existence of a disability and Select's knowledge thereof. In the alternative, Select argues that its adverse employment decision was based on a neutral hiring policy, which Plaintiffs have failed to prove (or even allege) was a pretext for unlawful discrimination. The Court has federal question subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331.

---

[1]Select Specialty Hospital-Northern Kentucky, LLC d/b/a Select Specialty Hospital is a subsidiary of Select Medical Corporation.

1

## I.      Factual and Procedural Background

This case revolves around Select's decision not to hire Lopreato or Taylor as nurses at its facility in northern Kentucky.  When Select made this decision, Plaintiffs allege they were disabled within in the meaning of the ADA based on chemical dependency issues, discussed more fully below.  Plaintiffs contend that Select's decision was motivated, at least in part, by their respective disabilities.

### 1.      Elley Lopreato

Lopreato was licensed by the Kentucky Board of Nursing ("KBN") as a registered nurse in June 1999, and began her career working in the ICU at St. Elizabeth Hospital ("St. Elizabeth") (Doc. #52 at 6).  In 2005, Lopreato transferred to the radiography unit, where she worked for approximately two years before St. Elizabeth discovered that she was stealing controlled substances for personal use. (*Id.*) Specifically, Lopreato was abusing a narcotic called fentanyl, which she had been diverting from her patients for several months. As a result, St. Elizabeth fired Lopreato in June 2007. (*Id.* at 7).

Shortly thereafter, Lopreato entered the Kentucky Alternative Recovery Effort for Nurses program ("KARE"), which is administered by the KBN. (*Id.*) KARE aims to rehabilitate nurses with chemical dependency issues, enabling them to return to competent and safe practice. (Doc #1 at 4-5). Nurses who wish to participate must expressly admit to "being a chemically dependent individual." (Doc. # 37-2 at 9). Additionally, participants must voluntarily enter into an agreement with KARE, which mandates absolute and continuing sobriety, in addition to a host of other evaluation, treatment, and drug testing requirements. (Doc. #1 at 5). In order to graduate, participants must adhere to the KARE program for no less than five (5) years. (*Id.*)

2

Lopreato enrolled in KARE to prevent more severe disciplinary action after the incident with St. Elizabeth. (Doc. # 52 at 14). Nevertheless, in connection with her program agreement, Lopreato's nursing license became subject to certain restrictions. (*Id.*) For an initial period, she was prohibited from working as a nurse in any manner. (Doc. # 37-2 at 9). This restriction was curtailed over time, and Lopreato was eventually permitted to work under limited circumstances, so long as her employer agreed to provide some level of supervision or monitoring. For instance, Lopreato could only administer narcotics if a doctor or nurse was available to assist. (Doc. # 37-2 at 20)

In November 2008, Lopreato began working for Cardinal Hill Specialty Hospital ("Cardinal Hill"), which operated a long-term acute care hospital ("LTACH") on the campus of the St. Elizabeth Medical Center in northern Kentucky. (Doc. # 52 at 7). Lopreato was still participating in KARE at this time, so her performance at Cardinal Hill was monitored by the KARE coordinators and she remained subject to the conditions of her program agreement. (*Id.* at 8). Lopreato was supervised by Cardinal Hill's Clinical Director, Theresa Schneider-Eubank, who knew of Lopreato's involvement with KARE and assisted whenever necessary to ensure her program requirements were satisfied. (*Id.* at 7). Lopreato remained at Cardinal Hill until the facility was taken over by Select in December 2011. (*Id.* at 7-8).

## 2.    Susan Taylor

Taylor was licensed by the KBN as a registered nurse in March 1993 and also began her career at St. Elizabeth. (Doc. # 52 at 8). Taylor worked on the surgical floor until approximately 1998, and then transferred to the Hospice unit, where she remained for several years. (*Id.*) Beginning in 2006, Taylor, who suffered from depression, began stealing morphine, methadone and vicodin. (*Id.*) In May 2007, she failed a drug test and

admitted to diverting her patients' "wasted" medications for personal use. (*Id.*) As a result, St. Elizabeth immediately terminated her employment. (*Id.*)

Like Lopreato, in order to avoid losing her nursing license, Taylor enrolled in the KARE program. (*Id.*) She too admitted to being chemically dependent and entered into an agreement with KARE that involved similar evaluation, treatment, and drug testing requirements. (Doc. 38-1 at 24, 30). Based on her participation in KARE, Taylor also had various restrictions imposed upon her license, which were lessened over time as she progressed within the program. (*Id.*)

In March 2011, Taylor was hired by Cardinal Hill based on Lopreato's recommendation. (Doc. # 52 at 10). Taylor was still participating in KARE at this time, so her performance at Cardinal Hill was monitored by the KARE coordinators and she remained subject to the conditions of her program agreement. (*See* Doc. 38-1 at 30). Taylor was supervised at Cardinal Hill by Schneider-Eubank, who knew of Taylor's obligations to KARE and assisted whenever necessary to ensure her program requirements were satisfied. (Doc. # 52 at 16). Taylor remained at Cardinal Hill until around December 2011, when Select took over the facility. (*Id.* at 17),

### 3. Cardinal Hill Closes and Select Takes Over the LTACH

In August 2011, Cardinal Hill decided to close its St. Elizabeth location. (Doc. #1 at 5). Around the same time, Select announced that it would take over the Cardinal Hill facility, which would continue to function as an LTACH under Select's ownership. (*Id.*) Over the following months, Cardinal Hill began winding down operations, and therefore made significant reductions to its workforce. (*Id.*) However, until the transition was complete, Select asked Cardinal Hill to keep enough employees on staff to support a limited patient

population. (Doc. # 52 at 16). Schneider-Eubank handled those staffing decisions, and Lopreato and Taylor were among the employees that she chose to retain. (*Id.* at 17).

By the end of the year, Select had finished its due diligence and was nearly ready to take over the LTACH. (*Id.*) As part of the final transition, Select considered several of the remaining Cardinal Hill nurses for continued employment. (*Id.*) When human resources personnel at Select inquired about Lopreato and Taylor, Schneider-Eubank opined that both women had an outstanding work history and were among her top performing nurses. Lopreato and Taylor submitted an application with Select, and both were given an opportunity to interview in December 2011.

Select's employment application included the following question: "Have you ever had your professional license restricted, suspended or terminated, or is your professional license currently under an investigation or review that could result in one of these actions? If yes, please explain." (*Id.* at 18). Lopreato and Taylor provided the same response, answering "yes" to the question, and writing in the provided explanation space "2007-no current restrictions." (*Id.*) Yet, at the time Lopreato and Taylor completed their applications, both were restricted by their program agreements from working more than 88 hours in two weeks or working a night shift without continuous supervision. (Doc. # 37-2 at 20; Doc. 38-1 at 35). Both were also limited in their ability to administer narcotics. (*Id.*)

### 4.    Select Decides not to hire Lopreato or Taylor

On December 6, 2011, Lopreato interviewed with Tammy Sparks, Select's Regional Human Resources Director. (Doc. # 52 at 18). Their discussion eventually shifted to Lopreato's application and her answer to the question about past or current licensing restrictions. (*Id.* at 19). Lopreato told Sparks that she enrolled in the KARE program after

5

leaving St. Elizabeth, and that she was scheduled to graduate in six (6) months. (*Id.*) Lopreato also explained that she was in KARE because she was sick and had family issues, but that she was nonetheless capable of performing her job duties. (*Id.*) However, Lopreato never specifically disclosed that her participation in KARE resulted from prior drug use, and Sparks made no further inquiries on this topic. (*Id.* at 19-20). Following her interview, Select did not contact Lopreato again about a nursing position at the LTACH. (*Id.* at 17).

On December 8, 2011, Taylor also interviewed with Sparks. Again, the conversation eventually turned to Taylor's answer on the application regarding licensing restrictions. (*Id.*) Taylor recalls telling Sparks that she was in "recovery," through KARE, and that she was scheduled to graduate in July. (*Id.*) Sparks congratulated Taylor on her progress, but she did not inquire as to what Taylor was in recovery for, nor did she ask about the nature of the KARE program. (*Id.* at 18-20). After the interview, Select did not follow up with Taylor regarding prospective employment. (*Id.* at 17).

Schneider-Eubank was under the impression that Select would retain all of the Cardinal Hill nurses she recommended for employment (*Id.* at 16). Thus, when she learned that Plaintiffs would not be hired, she attempted to intercede on their behalf by approaching Ms. Pat Alexander, Division Director of Clinical Services at Select. (Doc. # 52 at 20). Schneider-Eubank explained to Alexander that Lopreato and Taylor "were very good nurses, that they were in the process of completing their KARE program . . . [and that] that their evaluations were exemplary." (*Id.* at 21). She further insisted that KARE was a "very comprehensive program." (*Id.*). However, Schneider-Eubank never disclosed that Plaintiffs were in KARE as a result of drug abuse issues. (Doc. # 39 at 108). Alexander

6

communicated this information to her superiors at Select, but they told her that Lopreato and Taylor would not be hired due to recidivism concerns. (Doc. # 52 at 21).[2]

At the time these decisions were made, Mary Burkett was Select's Vice President of Clinical and Quality for the Inpatient Division. (Doc. # 52 at 22). Though Burkett initially denied having authority to unilaterally reject potential applicants, she later admitted that she "approved the decision not to hire Elley Lopreato and Susan Taylor for employment with Select." (*Id.*); (Doc. # 43-1 at 4, ¶ 9). In support of her decision, Burkett stated, "[i]t was my understanding that they both had restrictions on their license. It was my understanding that they had diverted drugs at a prior employer." (*Id.*) Burkett denies ever being told or otherwise having reason to know of Plaintiffs' issues with drug abuse or that Plaintiffs claimed to have any manner of disability. (*Id.* at 4, ¶ 10). In fact, she denied knowing or believing that Plaintiffs ever used drugs at all, testifying that in her experience diverted drugs are just as likely to be resold, given to family members, or used for recreational purposes. (*Id.*) She also claimed to be unaware that KARE was designed to rehabilitate chemically dependent nurses. (Doc. # 40 at 24-25).

Burkett's decision not to hire Plaintiffs was consistent with Select's hiring policy. According to Burkett, LTACHs "provide highly specialized care to promote recovery from the most critical and medically-complex patients." (Doc. # 43-1 at 2, ¶ 4) The majority of LTACH patients have been prescribed narcotics, and because the patient is usually incapacitated, LTACH nurses are often required to interact with family members, many of

---

[2] In her deposition, Schneider-Eubank testified that Alexander relayed statements to her such as, ". . . we have too much recidivism," and ". . . still no. Too much recidivism." (Doc. # 39 at 64-67). The identity of the corporate employee who made these statements is unknown, but Plaintiffs believe it was Mary Burkett. (*Id.* at 66); (Doc. # 52 at 21).

whom are experiencing severe grief or even shock as a result of their loved one's accident. (*Id.*) Due to these factors, the LTACH environment is highly demanding, and thus nurses "must be qualified to operate independently, without constant direct supervision." (*Id.* at 3, ¶ 5). As a result, Burkett submits that "it is Select's practice to not hire nurses who have current or previous restrictions or disciplinary action on their license." (*Id.* at 3, ¶ 6).

Burkett emphasizes that "[a] nurse may be subject to disciplinary action or restrictions for many different reasons, ranging from patient abuse, poor patient care, or drug diversion," and that "Select's practice is the same regardless of the reason for the disciplinary action or restriction." (*Id.*) Burkett also observes that in Select's experience "individuals who had engaged in past misconduct were likely to repeat misconduct." (*Id.* at 3, ¶ 7). And with its relatively small staff size, recidivism is a major concern because Select does not have the "resources to provide extra monitoring to ensure such misconduct, whether it be patient abuse, theft of drugs or other misconduct, not recur." (*Id.*)

### 5. Lopreato and Taylor File This Lawsuit

Plaintiffs insist that their history of drug abuse constitutes a disability within the meaning of the ADA. Believing that Select had discriminated against them on the basis of their disabilities, Lopreato and Taylor both filed charges with the EEOC. (Doc. # 1-5; Doc. # 1-6). After receiving their right to sue notices, they initiated this lawsuit on October 26, 2012. (Doc. #1). In Count One, Plaintiffs allege that: (1) "they each have a chemical dependency constituting a physical and/or mental impairment that substantially limits one more major life activities"; (2) they were "otherwise qualified" for the positions in question; (3) Select "had actual or constructive knowledge of Plaintiffs' Disability"; and (4) they were discriminated against in violation of the ADA when Select refused to hire them based on

their "Disability, record of a Disability, and/or because [Select] perceived [them] to be Disabled." (*Id.* at 11-12). In Count Two, Plaintiffs bring a separate claim for punitive damages. (*Id.* at 13).

## II.     Analysis

### 1.     Standard of Review

Summary judgment is appropriate when there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  If there is a dispute over facts that might affect the outcome of the case under governing law, then entry of summary judgment is precluded.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The moving party has the ultimate burden of persuading the court that there are no disputed material facts and that he or she is entitled to judgment as a matter of law.  *Id.*  Once a party files a properly supported motion for summary judgment by either affirmatively negating an essential element of the non-moving party's claim or establishing an affirmative defense, "the adverse party must set forth specific facts showing that there is a genuine issue for trial."  *Id.* at 250.  "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]."  *Id.* at 252.

### 2.     The McDonnell Douglas Burden Shifting Framework

The ADA prohibits discrimination "against a qualified individual on the basis of disability in regard to job application procedures, the *hiring*, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and

privileges of employment." 42 U.S.C. § 12112(a) (emphasis added). In order to state a claim for disability discrimination under the ADA, a plaintiff may provide either direct or indirect evidence of discriminatory treatment. *Johnson v. Kroger Co.*, 319 F.3d 858, 864-65 (6th Cir. 2003). Direct evidence allows the fact finder to conclude, without drawing any inferences, that the employer's actions were motivated by unlawful discrimination. *Id.* at 865. For example, a facially discriminatory employment policy would constitute direct evidence, as would an employer's statement of intent to terminate an employee based on a qualified disability. *Id.* The allegations here do not involve such blatantly discriminatory acts, and thus Plaintiffs are unable to support their claims using direct evidence.

Where direct evidence is unavailable, a plaintiff may present indirect evidence by employing the burden-shifting framework adopted in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Id.* at 866.[3]  The first step under this framework is to demonstrate a prima facie case of discriminatory treatment, which requires the plaintiff to prove the following elements: (1) he is disabled within the meaning of the ADA; (2) he is otherwise qualified for the position in question, with or without reasonable accommodation; (3) he suffered an adverse employment decision; (4) the employer knew or had reason to know of his disability; and (5) the position remained open while the employer sought other

---

[3] Plaintiffs do not cite any caselaw in either their complaint or response. As a result, the Court was required to surmise the legal posture of Plaintiffs' claim based on the structure of their arguments, as well as certain references Plaintiffs made to Select's motion, which was organized in terms of the applicable authority. In doing so, the Court finds that Plaintiffs' claim clearly tracks the *McDonnell Douglas* burden-shifting framework, and is therefore based on a theory of disparate treatment. *See Dunlap v. Tennessee Valley Auth.*, 519 F.3d 626, 629-30 (6th Cir. 2008) (distinguishing between claims of disparate impact and disparate treatment, and emphasizing that the *McDonnell Douglas* framework applies to the latter).

applicants or the plaintiff was replaced. *Whitfield v. Tennessee*, 639 F.3d 253, 259 (6th Cir. 2011).

Once the plaintiff establishes his prima facie case, the burden shifts to the defendant to demonstrate evidence of a legitimate, nondiscriminatory reason for its adverse employment decision. *Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876, 883 (6th Cir. 1996) (citing *McDonnell Douglas*, 411 U.S. at 802). If the defendant satisfies this burden, the plaintiff "must then prove by a preponderance of the evidence that the defendant's proffered reasons were not its true reasons, but were merely a pretext for illegal discrimination." *Id.* (internal quotations and citation omitted). In other words, the plaintiff "must produce enough evidence that a jury could reasonably reject the employer's explanation for its decisions." *Id.*

### a. Lopreato and Taylor's Prima Facie Case

In its motion for summary judgment, Select argues that Plaintiffs have failed to establish both the first and fourth elements of their prima facie case. (Doc. # 43 at 8). As to the first element, the ADA provides that an individual is considered to have a disability if: (1) he has a physical or mental impairment that substantially limits a major life activity (the "actual disability" prong), (2) he has a record of such an impairment (the "record of" prong"), or (3) others regard him as having such an impairment (the "regarded as" prong). 42 U.S.C. § 12102(1); 29 C.F.R. § 1630.2(g)(2).[4]  ADA regulations make clear that in order

---

[4]  Plaintiffs insist that their claims are actionable under all three prongs. (Doc. #1 at 11, ¶ 54). However, Select argues that Plaintiffs are limited to the "record of" prong because they failed to specifically reference either of the other two prongs in their EEOC charge forms.  Our sister circuits have found that "the decision whether to admit or exclude administrative findings, such as EEOC investigation matters, is properly left to the sound discretion of the trial court." *Doss v. Frontenac*, 14 F.3d 1313, 1318 (8th Cir. 1994).  Thus, having noted that the EEOC charge form

to satisfy the first or second prong, a plaintiff must not only demonstrate that he has a *physical or mental impairment*, but also that the impairment affected a *major life activity*, and did so in such a way as to constitute a *substantial limitation*. *See id.* § 1630.2(g)(3) (providing that an actual disability or a record thereof "require a showing of an impairment that substantially limits a major life activity or a record of a such an impairment").

For present purposes, drug abuse can certainly qualify as a physical or mental impairment. *MX Grp., Inc. v. City of Covington*, 293 F.3d 326, 336 (6th Cir. 2002). This is true even for individuals such as Lopreato and Taylor, who "have successfully completed or are participating in a supervised drug rehabilitation program and are no longer using illegal drugs." *Hernandez v. Hughes Missile Sys. Co.*, 362 F.3d 564, 568 (9th Cir. 2004) (citation omitted). As to what qualifies as a major life activity, the ADA regulations include a broad listing of examples, and the activities pled by Lopreato and Taylor – learning, concentrating, thinking, communicating, and working – are included within that listing. 29 C.F.R. § 1630.2(i)(1)(i); (Doc. #1 at 11, ¶ 54). Thus, with respect to the first two prongs, the only remaining issue is whether Plaintiffs have established a substantial limitation.

An impairment qualifies as a disability within the meaning of the ADA "if it *substantially limits* the ability of an individual to perform a major life activity as compared to most people in the general population." *Id.* § 1630.2(j)(1)(ii) (emphasis added). Plaintiffs contend that being terminated by St. Elizabeth demonstrates a substantial limitation

---

does not specifically refer to any of the above prongs, but merely requires the complainant to check "disability" as the general category of discrimination, the Court will consider all three prongs of disability as alleged in Plaintiffs' complaint. (Doc. # 1-5).

regarding their ability to work. (See Doc. # 52 at 28).[5] They also rely heavily on the testimony of Dr. Butler, who describes their drug abuse as a "kind of global impairment in judgment that was impacting their lives in a variety of circumstances." (Doc. # 51-1 at 194). However, the Court finds that Plaintiffs' depositions tell another story altogether. Lopreato testified that fentanyl did not hinder her ability to concentrate or communicate, or negatively affect the level of patient care she provided. She testified further that using fentanyl did not impair her ability to care for herself or her children, complete household chores, or pursue her master's degree. (See Doc. # 37 at 65-69). Taylor made similar statements regarding the effects of her own drug use. (See Doc. # 38 at 13, 55-56, 67-68). Considering this testimony, the Court has serious doubts that Plaintiffs' alleged impairments ever rose to the level of a substantial limitation.

The third disability prong involves a completely different standard. A person is "regarded as" having a disability if he "is subjected to a prohibited action because of an actual or perceived physical or mental impairment, whether or not that impairment substantially limits, or is perceived to substantially limit, a major life activity." *Id.* § 1630.2(j)(1)(ii). The ostensible advantage of this prong is that a plaintiff can be considered disabled without having an actual disability, so long as the employer perceives the plaintiff as having some manner of physical or mental impairment. Even under this somewhat relaxed standard, the Court is rather skeptical that Plaintiffs can proceed with their claims.

---

[5] Seeing as both Lopreato and Taylor later found comparable positions at Cardinal Health, despite Schneider-Eubank being aware of their histories with drug abuse, the Court finds that being terminated by St. Elizabeth, by itself, falls well short of establishing a substantial limitation. *See Wolfe v. U.S. Steel Corp.*, 567 F. App'x 367, 371 (6th Cir. 2014) ("When working is the affected major life activity, the statutory phrase 'substantially limits' requires, at a minimum, that plaintiff allege that he is unable to work a broad class of jobs.").

While Lopreato and Taylor insist they were regarded as being disabled due to their involvement with KARE, the Court observes that Select never inquired as to why they were made to participate in this program. Schneider-Eubank testified that she did not divulge this information to anyone at Select, and, when asked, she provided nothing but positive feedback regarding Plaintiffs' competence as nurses.

The fourth element under *McDonnell Douglass* asks whether Select knew or had reason to know of Plaintiffs' alleged disabilities. In the Court's opinion, this question is tantamount to asking if Select perceived Lopreato and Taylor as having an impairment at the time of their interviews. Thus, based on the same facts and arguments that were used to address the "regarded as" prong, the Court is equally doubtful that Plaintiffs can satisfy the fourth element of their prima facie case.

If the standard on summary judgment merely asked which party has made a more convincing argument, then Select would undoubtedly prevail on the issues discussed above. However, what the Court must actually decide is whether there is any evidence upon which a reasonable juror could find that Plaintiffs have established the challenged elements of their prima facie case. Admittedly, this is a more difficult question, and it is complicated further by the 2008 amendments to the ADA, which appear to have relaxed the burden of demonstrating a qualified disability.[6] Therefore, following the Sixth Circuit's

---

[6] The ADA regulations now provide that "[t]he term 'substantially limits' shall be construed broadly in favor of expansive coverage, to the maximum extent permitted by the terms of the ADA." 29 C.F.R. § 1630.2(j)(1)(i). Clearly, the purpose of such language is to ensure that more impairments are found to qualify as a substantial limitation; yet, the regulations also leave room for exceptions. "Nonetheless, not every impairment will constitute a disability within the meaning of this section." *Id.* § 1630.2(j)(1)(ii). While the Court strongly believes that the case at hand involves exactly the type of circumstances that would warrant such an exception, it is difficult to know for sure given the remarkable lack of authority in the Sixth Circuit and elsewhere interpreting these recently amended provisions.

approach in *Bailey v. Real Time Staffing Servs., Inc.*, the Court finds it appropriate to defer these issues for now and look ahead to the remaining aspects of *McDonnell Douglas*.[7] After all, Select has clearly pled a neutral reason for its adverse employment decision. And if Plaintiffs have failed to rebut this reason with sufficient evidence of pretext, which certainly appears to be the case, the Court can grant Select's motion for summary judgment on this basis alone.

### b.     Select's Legitimate, Nondiscriminatory Reason

Select maintains that its decision was based on the company practice of not hiring nurses with any manner of past or current licensing restriction. The United States Supreme Court considered whether a similar hiring policy qualified as a legitimate, nondiscriminatory reason in *Raytheon Co. v. Hernandez*, 540 U.S. 44 (2003). There, Hernandez was forced to resign from Hughes Missile Systems ("Hughes") after failing a drug test. *Id.* at 46-47. Two years later, he reapplied for his previous position, submitting a letter from his sponsor at Alcoholics Anonymous ("AA") along with his employment application. *Id.* Upon learning that Hernandez was a former employee, labor relations employee Joanne Bockmiller pulled his personnel file and reviewed the employee separation summary, which stated generically that Hernandez had been discharged for workplace misconduct. *Id.* Bockmiller rejected his application immediately, testifying that it was company policy not to rehire employees who were previously terminated for any violation of workplace conduct rules. *Id.*

---

[7] *See* 543 F.App'x 520, 523-24 (6th Cir. 2013) (finding it was unnecessary to resolve whether the plaintiff had stated a prima facie case because "it is apparent that [the plaintiff] cannot overcome Real Time's proffered legitimate reason for firing him.").

Applying the *McDonnell Douglas* framework, the Ninth Circuit had ruled that Hughes's no-rehire policy was not a neutral basis for denying Hernandez's application. *Id.* at 51. While conceding that such a policy was lawful on its face, the court found:

> [m]aintaining a blanket policy against rehire of all former employees who violated company policy not only screens out persons with a record of addiction who have been successfully rehabilitated, but may well result . . . in the staff member who makes the employment decision remaining unaware of the "disability" and thus of the fact that she is committing an unlawful act . . . . Accordingly, Hughes's unwritten policy is not a 'legitimate, nondiscriminatory reason' for its rejection of Hernandez's application.

*Hernandez v. Hughes Missile Sys. Co.*, 298 F.3d 1030, 1036 (9th Cir. 2002). On appeal, the Supreme Court reversed, reasoning that the Ninth Circuit "erred by conflating the analytical framework for disparate-impact and disparate-treatment claims."[8] *Hernandez*, 540 U.S. at 51. The Court further observed that Hernandez had not timely pled a disparate-impact claim, as it was first raised in his response to the Hughes's motion for summary judgment. *Id.* at 49. The Court held that had the Ninth Circuit properly applied the disparate-treatment framework, "it would have been obliged to conclude that a neutral no-rehire policy is, by definition, a legitimate, nondiscriminatory reason under the ADA." *Id.* at 51. Accordingly, the case was remanded with instructions to proceed to the next step within the *McDonnell Douglas* framework.

Here, Plaintiffs also argue that Select has failed to offer a legitimate, nondiscriminatory reason for its adverse employment decision. Plaintiffs' rationale is

---

[8] The Court explained the distinction between these claims, stating, "Liability in a disparate-treatment case depends on whether the protected trait . . . actually motivated the employer's decision . . . [whereas] disparate-impact claims involve employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity." *Id.* at 52. (internal quotations and citations omitted).

remarkably similar to the Ninth Circuit's reasoning in *Hernandez,* in that Plaintiffs appear to base their position primarily on the disparate-impact of Select's hiring practice. For example, in their response, Plaintiffs contend that "if Select's 'neutral policy' were allowed and/or sanctioned to be legitimate, and other similarly situated hospitals and/or medical practices adopted the same policy, then and in that event, those licensees that have gone through an 'alternative recovery program' could never practice any mainstream environment." (Doc. # 52 at 30). Plaintiffs also appear to challenge the business rationale of Select's hiring policy, refuting the proposition that nurses who require supervision due to licensing restrictions are ill-suited to work in the LTACH environment. (*Id.* at 31-36).[9]

However, as the Court in *Hernandez* observed, such disparate-impact arguments are not applicable at any stage within the *McDonnell Douglas* framework. And thus, *Hernandez* is instructive for at least two reasons. First, given the similarity between Hughes's no-rehire policy and Select's practice of employing only those nurses with a clean license, the Court finds that Select has also demonstrated a legitimate, nondiscriminatory reason for its adverse employment decision. Second, by holding that untimely claims of disparate impact have no bearing on a case which is clearly premised on allegations of disparate treatment, the *Hernandez* decision also allows this Court to disregard Plaintiffs' arguments above. Accordingly, the Court will proceed to the final aspect of the *McDonnell*

---

[9] For reasons explained above, the Court has been required at times to surmise the legal posture of Plaintiffs' arguments. *See supra* n. 3. In this instance, the Court finds that the arguments contained in Plaintiffs' response from pages 29 to 36 demonstrate an attempt to prove the disparate impact of Select's policy by showing its negative effect on a particular group (nurses in a drug rehab program) and by challenging its underlying business necessity. Because Plaintiffs' complaint only alleges a claim based on disparate treatment, *see id.*, such arguments are untimely pursuant to *Hernandez*.

*Douglas* framework: whether Select's legitimate hiring policy was merely a pretext for illegal discrimination.

### c.    Evidence of Pretext

To reiterate, a plaintiff's burden at the pretext stage is to prove by a preponderance of the evidence that a jury could reject the employer's neutral explanation for its adverse decision. *Kocsis*, 97 F.3d at 883. "That is, the plaintiff may attempt to establish that he was the victim of intentional discrimination by showing that the employer's proffered explanation is unworthy of credence." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 143 (2000) (citation and internal quotations omitted). In determining whether this burden is met, a court may consider the evidence used by the plaintiff to establish his prima facie case, in addition to any other evidence, circumstantial or direct, proving that the employer's adverse decision was actually motivated by a protected disability. *Hernandez v. Hughes Missile Sys. Co.*, 362 F.3d 564, 568 (9th Cir. 2004).

For example, on remand in *Hernandez*, the Ninth Circuit  emphasized a position statement written by the Manager of Diversity Development at Raytheon (the parent company of Hughes) in response to the charges filed with the EEOC. *Id.* at 567. The statement provided, in part, that "[Hernandez's] application was rejected based on his *demonstrated drug use* while previously employed and the complete lack of evidence indicating successful drug rehabilitation." *Id.* (emphasis added). The court also noted that Joanne Bockmiller, who rejected the Hernandez application, not only received the AA letter describing his recovery efforts, but also had access to his personnel file, containing the results of his failed drug test. *Id.* at 569. The Ninth Circuit found that such circumstances

were sufficient to raise genuine issues of material fact as to whether Hughes's no-rehire policy was merely a pretext for illegal discrimination. *Id.* at 568.

By comparison, the evidence in this case is far less compelling.[10] The strongest argument, perhaps, is that Burkett admitted to knowing that Plaintiffs were fired from St. Elizabeth for diverting controlled substances, and that such knowledge goes towards establishing her discriminatory intent. Yet, even when construed in the light most favorable to Plaintiffs, it would be a quite a stretch to infer from Burkett's admission that she also believed Plaintiffs were suffering from (or recovering from) a debilitating drug addiction, and that this belief motivated her decision not to hire them. After all, the incidents with St. Elizabeth each occurred more than four years before Plaintiffs' interviews. Moreover, Burkett testified that in her experience stolen drugs are just as likely to be resold, given to family members, or used merely for recreational purposes.

Another potentially helpful circumstance to Plaintiffs is that the KARE program was mentioned during both of their interviews. However, the parties' testimony demonstrates that it was discussed only in passing. Sparks never inquired as to the nature of the program or the reason that Plaintiffs' participation was mandatory, and Schneider-Eubank testified that she never disclosed this information to anyone at Select. More importantly, Sparks was not provided with any documentation regarding Plaintiffs' recovery efforts, such as letters

---

[10] Though Plaintiffs have argued that Select failed to put forth a legitimate, nondiscriminatory reason for its adverse decision, discussed *supra*, Plaintiffs have not argued, in any respect, that Select's policy was a pretext for unlawful discrimination. On this basis alone, the Court could conclude that Plaintiffs have failed to satisfy their required burden under the *McDonnell Douglas* framework. Yet, out of an abundance of caution, the Court has identified the evidence it believes could have been offered to make this showing. For the reasons discussed below, the Court finds this evidence is insufficient to withstand summary judgment.

from the KARE coordinators or the results of any drug tests, as was the case in *Hernandez*. In the Court's view, Select's interest in KARE, if any, was merely incidental to discovering whether Plaintiffs' nursing licenses were subject to any restrictions; once this was confirmed, KARE was no longer relevant. (Doc. # 41 at 74-77, 87-88).

One might possibly infer discriminatory intent from Select's use of the word "recidivism" in explaining why it would not hire Lopreato and Taylor. But the Court observes that this term was used in a generic sense, which is consistent with Burkett's testimony that Select was concerned with recidivism as to all manner of licensing restrictions, whether resulting from drug use, patient abuse, or any other form of misconduct. And when compared with the position statement submitted to the EEOC in *Hernandez*, wherein Hughes explained that the plaintiff was rejected based on his "demonstrated drug use," Select's isolated use of the word "recidivism" is almost completely immaterial.

There are also aspects of the policy itself showing that the proffered motivation for Select's adverse decision is worthy of credence. For instance, the employment applications completed by Lopreato and Taylor both asked, "Have you ever had your professional license restricted, suspended or terminated, or is your professional license currently under investigation or review." (Doc. 1-3 at 1). And after discussing her restrictions with Sparks during the interview, Lopreato testified that she "definitely knew that there was something wrong." (Doc. #37 at 51). Thus, unlike in *Hernandez*, where the no-rehire policy surfaced only after litigation had commenced, Select's practice of not hiring nurses with a restricted license was evident from the very beginning. The Court also finds that Select's hiring policy was justifiable under the circumstances. As Burkett explained, the LTACH environment is very demanding, and Select cannot afford to employ nurses who require additional

supervision in connection with any sort of licensing restriction. In the Court's opinion, the plausibility of this rationale, combined with the fact that Plaintiffs have been unable to identify a single employee at Select with any manner of licensing restriction, strongly belies any argument that the hiring policy at issue was merely a pretext for illegal discrimination.

Finally, and somewhat surprisingly, Plaintiffs themselves seem convinced that Select's adverse employment decision was based upon the aforesaid hiring practice, and not their alleged disabilities. In their response, Plaintiffs state:

> [i]n sum, the evidence clearly indicates the disqualification of Ms. Lopreato and Ms. Taylor as applicants for hire and/or retention at [Select] was based upon the parent corporation's verbal 'practice' wherein all applicants who held healthcare licensure and had either active or prior restrictions were automatically disqualified without regard to ability, sobriety, or whether or not they were currently in a recovery program.

(Doc. # 52 at 13). Plaintiffs further observe that "[t]he only criteria in this circumstance was whether or not Ms. Lopreato and Ms. Taylor had, or did have, a restriction on their licensure." (*Id.* at 20).

The Court concludes that Select's decision with respect to Lopreato and Taylor was motivated by a neutral company policy not to hire nurses with any form of licensing restriction. Plaintiffs' claims of disability discrimination therefore fail as a matter of law, as do their claims for punitive damages. *Dalton v. Animas Corp.*, 913 F.Supp.2d 370, 378 (W.D. Ky. 2012) ("A claim for punitive damages is not a separate cause of action, but a remedy potentially available for another cause of action.").

**III.    Conclusion**

Accordingly, for the reasons stated herein,

**IT IS ORDERED** as follows:

(1)    Defendants' Motion for Summary Judgment (Doc. # 43) be, and is hereby,

**granted in full**; and

(2)    A Judgment shall be entered contemporaneously herewith.

This 3rd day of December, 2014.



Signed By:
David L. Bunning
United States District Judge

G:\DATA\Opinions\Covington\2012\12-217 MOO Granting MSJ.wpd